UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| DAPHENE PELLETIER,<br><br>               Plaintiff<br><br>v.<br><br>YELLOW TRANSPORTATION, INC.,<br><br>               Defendant | Civil No. 07-44-P-S |

**ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND MOTION TO COMPEL ARBITRATION**

Plaintiff Daphene Pelletier filed this action alleging that she had been discriminated against by Defendant Yellow Transportation, Inc. ("Yellow"). Specifically, Plaintiff alleges claims based on sex discrimination under Title VII of the Civil Rights Act of 1964 and the Maine Human Rights Act (Count I); age discrimination under the Maine Human Rights Act (Count I); and whistleblower retaliation under the Maine Human Rights Act (Count II). Now before the Court is Defendant Yellow Transportation's Motion for Summary Judgment or, in the alternative, Motion to Compel Arbitration. (Docket # 11.)

**I. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Santoni v. Potter, 369 F.3d 594, 598 (1st Cir.

2004). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni, 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted). Although the First Circuit has not offered a standard for assessing a moving party's factual showing to support a motion to compel, other courts have employed a standard similar to that applicable to motions for summary judgment. See, e.g., Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003); Tinder v. Pinkerton Sec., 305 F.3d 728, 735 (7th Cir.

2002); Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 n. 9 (3d Cir. 1980); Boulet v. Bangor Sec., Inc., 324 F.Supp.2d 120, 123 (D. Me. 2004).

## II. FACTS

The parties' statements of material facts include the following undisputed material facts. Yellow is a motor carrier that provides transportation services for goods throughout North America. (Affidavit of Bruce Jacobs ¶ 2.) Sometime in 2000, Ms. Pelletier was hired by Bruce Jacobs to work at Yellow's Bangor terminal as a temporary employee through the Kelly Services temping agency.[1] (Affidavit of Daphene Pelletier ¶ 3.) In March 2003, Yellow's Bangor terminal closed. (Id. ¶ 4.) At the time of the Bangor terminal's closure, Plaintiff lost her job at Yellow and Mr. Jacobs was reassigned to manage the Waterville terminal. (Id.; Jacobs Aff. ¶ 1.)

On July 31, 2003, Plaintiff applied for an outbound clerical position at Yellow's Waterville facility. (Application for Employment, Ex. A attached to Pelletier Aff.; Pelletier Aff. ¶ 11.) The application of employment states that "[t]his application will be considered active for a maximum of thirty (30) days. If you wish to be considered for employment after that time, you must reapply." (Ex. A attached to Pelletier Aff. at 4.) At the time Plaintiff filled out Yellow's employment application, Bruce Jacobs provided her with a document entitled "Dispute Resolution Agreement" (hereinafter "DRA"). (Pelletier Aff. ¶ 11.) Plaintiff signed the DRA as part of the employment application process. (Dispute Resolution Agreement, Ex. B attached to Pelletier Aff.)

---

[1] Ms. Pelletier has worked in the trucking industry for over 14 years before being hired by Yellow in 2000. (Pelletier Aff. ¶ 2.)

In early September 2003, Plaintiff was offered, accepted and began work as Terminal Support Assistant II at Yellow.[2] (Letter dated September 3, 2003, from Jacobs to Pelletier, Ex. C attached to Pelletier Aff.; Pelletier Aff. ¶ 12; Jacobs Aff. ¶ 6.) In this position, Plaintiff was responsible for data entry, providing administrative support for other employees at the facility and assisting in providing customer service. (Jacobs Aff. ¶ 6.) On or about April 9, 2004, Yellow promoted Plaintiff to an exempt salaried position as Operations Supervisor for the Waterville terminal's outbound operations. (Letter dated April 9, 2004 from Jacobs to Pelletier, Ex. D attached to Pelletier Aff.; Pelletier Aff. ¶ 13; Jacobs Aff. ¶ 7.) Approximately one month before being promoted, Ms. Pelletier had started working as the Operations Supervisor. (Ex. D attached to Pelletier Aff.; Second Jacobs Aff. ¶ 12; Jantzen Aff. ¶ 8.) One of Plaintiff's responsibilities as Operations Supervisor was to dispatch line haul drivers, who transport goods between cities and across state lines. (Yellow's Operations Supervisor Job Description, Ex E ¶ 4 attached to Pelletier Aff.; Pelletier Aff. ¶ 16.) As part of the line haul dispatching function, Plaintiff engaged in the following:

> (i) initiated loading of all out-of-state orders upon receipt at the terminal;
> (ii) set up trailers to be loaded;
> (iii) summoned each line haul driver two hours prior to dispatch, which was determined by what time her crew got the loads ready;
> (iv) assigned each driver with a destination, trailer number, tractor number and dolly number;
> (v) provided each line haul driver with meal money;
> (vi) dispatched each line haul driver in the computer;
> (vii) upon return to the Waterville terminal, approved each line haul driver's line haul trip sheets which are used for payroll; and

---

[2] Although the letter confirming Plaintiff's employment is dated September 3, 2003, the letter indicates that her "start date in this position will be Monday September 1, 2003," and her signature on the letter is dated September 1, 2003. (Letter dated September 3, 2003 from Jacobs to Pelletier, Ex. C attached to Pelletier Aff; Pelletier Aff. ¶ 12; Second Affidavit of Bruce Jacobs ¶ 11; Affidavit of Joelle Jantzen ¶ 7.)

    (viii) conducted line haul driver safety meetings.

(Pelletier Aff. ¶ 17.) In addition to Ms. Pelletier's duties with respect to line haul drivers, her responsibilities included directing and supervising the dockworkers, who loaded Yellow's trucks and drove the trucks locally. (Jacobs Aff. ¶ 9.)

  On May 12, 2006, Plaintiff's employment with Yellow was terminated. As a result of the termination, Plaintiff filed the instant action alleging that Yellow discriminated against her on the basis of her age and sex and retaliated against her for whistleblower activities.

### III. DISCUSSION

  Defendant contends that the Court lacks subject matter jurisdiction to consider Plaintiff's Complaint because Plaintiff agreed in the DRA to resolve any disputes arising out of her employment or cessation of employment with Yellow by arbitration.[3] Plaintiff responds that the DRA is unenforceable for three reasons: (1) because there was no meeting of the minds before it lapsed; (2) even if the July 31, 2003 promise to arbitrate persisted beyond August 31, 2003, it was extinguished by Plaintiff's September 3, 2003 hire; and (3) to the extent it was an enforceable promise to arbitrate as of her September 3, 2003 hire, it became unenforceable on April 9, 2004 when Plaintiff accepted the promotion as Operations Supervisor.

  When confronted with the question of arbitrability, a district court must determine, as a threshold matter, whether the claim before it is subject to arbitration.

---

[3] Plaintiff contends that Yellow's filing of a summary judgment motion is inconsistent with its assertion of its arbitral right. Therefore, according to Plaintiff, Yellow has waived its right to arbitrate. By filing the instant motion to resolve the gateway issue of whether an enforceable agreement to arbitrate exists between the parties, Yellow has not waived its rights under the DRA. Plaintiff invoked the judicial process in the first instance and Defendant, by requesting resolution of this threshold issue, has not prejudiced Plaintiff's rights. Yellow asserted its right to arbitration from the beginning of the case and will not, therefore, be deemed to have waived it by virtue of seeking judicial enforcement of that right.

5

This determination mandates two specific inquiries. The Court first asks whether there is a valid agreement to arbitrate; if so, the Court then asks whether the dispute in question falls within the scope of the agreement. Here, Plaintiff concedes that if the Court finds that the DRA contains an enforceable promise to arbitrate, then "the scope of that promise plainly covers the employment discrimination claims brought by Plaintiff in this lawsuit," therefore, the Court need only make the first of these two determinations, that is, whether a valid agreement to arbitrate exists. (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment or, in the Alternative, Motion to Compel at 8.)

In determining whether the parties have agreed to arbitrate, the Court applies ordinary state law principles that govern the formation of contracts. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). The parties do not dispute that Maine choice of law principles apply to this case and that the application of those principles leads to the application of Maine law. Plaintiff executed the DRA in Maine in connection with a job she applied for in Maine. The job that Plaintiff applied for was to be performed in Maine at Defendant's Waterville facility. There is no other state that has any more significant relation to Plaintiff's promise to arbitrate than Maine.

### A. Enforceability of the DRA

The DRA provides, in pertinent part, Plaintiff and Yellow agree to:

> resolve all disputes, claims or controversies arising out of, or related to, [Plaintiff's] application for employment, [Plaintiff's] employment or the cessation of [Plaintiff's] employment with Yellow that would otherwise require or allow resort to a court or other governmental tribunal ("Employment Claims") exclusively by final and binding arbitration before a neutral arbitrator.

(Ex. B attached to Pelletier Aff.).  The DRA defines Employment Claims to include, but are not limited to, "claims of discrimination, harassment or retaliation . . . brought against Yellow, whether based on local, state or federal laws or regulations, or on tort, contract or equitable law, or otherwise."  Id.  The DRA further provides, "[b]y way of example only," that Employment Claims include "claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, including the amendments of the Civil Rights Act of 1991 . . . ."  Id.

Plaintiff first asserts that the DRA is unenforceable because she was required to sign the DRA in connection with her application of employment, the DRA and the application of employment together constituted her offer to work for Defendant as an outbound clerical worker, and her employment application lapsed before it was accepted by Yellow.  (Plaintiff's Memorandum in Opposition at 10.)  Relying on the provision of the employment application form, which states that "[t]his application will be considered active for a maximum of thirty (30) days.  If you wish to be considered for employment after that time, you must reapply," Plaintiff contends that because she was not offered a job by Defendant until September 3, 2003 – 34 days after her offer was made – Defendant's acceptance was too late, and there was no meeting of the minds.

Under ordinary contract principles, an "agreement is to be interpreted to effect the parties' intentions as reflected in the written instrument, construed with regard for the subject matter, motive, and purpose of the agreement, as well as the object to be accomplished."  Biddeford Internet Corp. v. Verizon New England, Inc., 456 F. Supp. 2d 165, 171-72 (D. Me. 2006) (quoting V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co., 2001 ME 73, ¶ 3, 770 A.2d 95, 96 (citation omitted)).  The issue of whether contract language

7

is ambiguous and, if unambiguous, the interpretation of the unambiguous contract are questions of law for the Court. See Portland Valve, Inc. v. Rockwood Systems Corp., 460 A.2d 1383, 1387 (Me. 1983). The DRA is unambiguous on its face and clearly indicates the parties' intent to resolve all disputes arising out of Plaintiff's application for employment, her employment, or the cessation of her employment with Yellow through arbitration.

The Court disagrees that the DRA lapsed. First, unlike the employment application, the DRA itself contains no reapply or lapse language. Moreover, although signed in connection with the employment application, the DRA is not contingent on any offer of employment being extended. In fact, the DRA encompasses disputes that arise out of Plaintiff's application for employment with Yellow – even if no offer of employment was ever extended. Plaintiff admits that she signed the DRA so that she could be considered for employment with Yellow. The DRA clearly states that the parties agree to have their disputes over issues related to "employment or the cessation of [] employment" decided through "final and binding arbitration before a neutral arbitrator." (Ex. B ¶ 1 attached to Pelletier Aff.) Plaintiff accepted a position as Terminal Support Assistant II with Yellow and continued to be employed in that capacity for approximately nine months before being promoted. By signing the DRA, Plaintiff agreed to the clear and unambiguous condition that any employment disputes will be decided by binding arbitration.

Plaintiff also argues that the DRA was superseded by another provision of Yellow's employment application form, which states:

> If hired, I agree as follows: I will comply with all of Yellow's rules, regulations and code of conduct. My employment and compensation are

> terminable at will, are for no definite period, and can be terminated, with or without cause, and with or without notice, by either Yellow or myself. No implied or oral agreements contrary to the express language of this agreement are valid. No supervisor, manager or other representative of Yellow, other than its president, has any authority to make any agreement for employment for any specified period of time or to make any agreement contrary to the foregoing and any such agreement must be in writing and signed by Yellow's president and me. *This agreement is the entire agreement between Yellow and me regarding my right and Yellow's right to terminate employment, and this agreement takes the place of all prior or contemporaneous agreements, representations, and understandings between Yellow and me.*

(Ex. A ¶ 4 attached to Pelletier Aff. (emphasis added).)  The Court disagrees. The above terms, included in Yellow's application for employment, specifically address the parties' agreement regarding their "right to terminate employment." The DRA does not address either party's *right* to terminate employment. Rather, the DRA simply provides that if an issue arises regarding the termination of employment, it will be resolved by arbitration. Therefore, there is no conflict between the terms of the DRA and the terms of the employment application as they relate to the right of either party to terminate employment.

Finally, Plaintiff contends that the DRA became unenforceable on April 9, 2004, when Plaintiff accepted a promotion to Operations Supervisor. Specifically, Plaintiff contends that the term "employment" in the DRA "cannot be construed to include a position of employment of vastly different scope, with vastly different responsibilities and vastly different pay from that which Plaintiff applied for on July 31, 2003." (Plaintiff's Opposition Memorandum at 13-14.) The Court finds that based on the language of the DRA itself the parties intended that it shall control the forum for the resolution of employment disputes that arise between the parties. Although Plaintiff signed the DRA in connection with her application for the position of outbound clerical

worker, nothing in the DRA so limits its application. Moreover, there is no evidence in the record that the parties intended the DRA to be limited to Plaintiff's employment as an outbound clerical worker. Indeed, the DRA simply refers to disputes that may arise during Plaintiff's employment with Yellow. Therefore, the DRA's application is not limited to Plaintiff's employment in the position she applied for when she signed the DRA; rather the DRA covers any position in which Plaintiff is employed by Yellow. The Court finds, therefore, that the DRA is enforceable and, as conceded by Plaintiff, controls the instant dispute.

### B. Law Applicable at Arbitration

The DRA at issue in this case provides that "the dispute resolution process shall be controlled by the Federal Arbitration Act ("FAA"). If for any reason the FAA does not apply or if the FAA is silent on the issue, then the provisions of the Indiana Uniform Arbitration Act (Indiana Code 34-57-2), shall apply (to the extent they do not conflict with the FAA) and subject Employment Claims to arbitration." (Exhibit B attached to Pelletier Aff.) The parties have also briefed the application of the FAA to the instant dispute. The Court concludes that this issue is properly left for the arbitrator to decide.

In <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 82-83 (2002), the Supreme Court was faced with the question of whether the application of a National Association of Securities Dealers ("NASD") rule imposing a time limit on submission of disputes for arbitration was a matter presumptively for the court or for the NASD arbitrator. The Court acknowledged that "[t]he question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise,"

id. at 83 (citations and internal alteration omitted), and framed the issue before it as "whether application of the NASD time limit provision falls into the scope of this . . . interpretive rule." Id.  After examining the role of judges in resolving issues related to arbitration, the Court stated that "questions of arbitrability," which are presumptively for the court to decide, are limited to gateway disputes that the "contracting parties would likely have expected a court to have decided . . . , where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing the parties to arbitrate a matter that they may well not have agreed to arbitrate." Id. at 83-84.  The Court noted that disputes about "whether the parties are bound by a given arbitration clause," and disagreements over "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" are two types of "question[s] of arbitrability" to be decided by the court. Id. at 84.  By contrast, "procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." Id. (citation and emphasis omitted).  As an example, the Court stated that "the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'" Id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

      The Court of Appeals for the First Circuit has not addressed this issue in the choice of law clause context as presented in the instant case.  However, interpreting Howsam the First Circuit has held that the issue of the validity or interpretation of an arbitral forum selection clause is a procedural issue for an arbitrator, not the court, to decide.  See Richard C. Young & Co., Ltd. v. Leventhall D.D.S., M.S., 389 F.3d 1, 4-5

11

(1st Cir. 2004). Following <u>Howsam</u> and <u>Young</u>, the Court finds that the issue of what choice of law provision in the DRA applies during arbitration is a matter that should be decided by the arbitrator.

Accordingly, the Court ORDERS that Defendant's Motion for Summary Judgment and Motion to Compel Arbitration be, and they are hereby, GRANTED.[4]

                                              /s/ George Z. Singal
                                              Chief United States District Judge

Dated at Portland, Maine this 30th day of August, 2007.

---

[4] The Court will not order a stay in this case because it appears that all Plaintiff's claims are subject to arbitration and neither party has requested a stay. <u>See</u> 9 U.S.C. § 3 ("the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.")